**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| PERRY SIMMS, ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: |
| v. ) | |
| ) | |
| JAMES LEBLANC, RAMAN SINGH, ) | Judge _____ |
| DARRYL VANNOY, STEPHANIE ) | |
| LAMARTINIERE, LT. J. BUTLER, ) | |
| DEPT. OF PUBLIC SAFETY & ) | |
| CORRECTIONS, and DOES 1 – 10, ) | Magistrate _____ |
| ) | |
| Defendants. ) | |

## COMPLAINT

COMES NOW Plaintiff Perry Simms (DOC # 124012), by and through undersigned counsel, to file

this Complaint against the Defendants. In support, he states the following:

### I. INTRODUCTION

1. On May 25, 2016, Angola inmate Perry Simms woke up in his dormitory with intense chest pain,

dizziness, and a feeling that he had to vomit but could not. At 2:20 a.m., Perry asked the guard on duty,

Lt. J. Butler, to call for an EMT because he was afraid he was having a heart attack.

2. At 2:45 a.m., an EMT arrived and evaluated Perry. The EMT noted Perry's chest pain was

"sharp" and that Perry was having difficulty walking, and so confirmed that he was having a possible

heart attack. He wrote Perry a pass and requested that the security officers transport him to Angola's

clinic. But the security officers refused. They said they had no patrol driver, and so could not take him to

the clinic.  (This was nothing new – a month earlier, Perry had a medical appointment rescheduled

because they had no patrol driver.)

3. Instead of calling an ambulance or driving Perry to the clinic themselves, the security officers

ordered Perry back to his dormitory. The EMT left without giving Perry nitroglycerin or even an aspirin,

and without fulfilling any of the other protocols of the relevant EMS Guidelines.

1

4.   For the next five hours, Perry lay in his bed in the dormitory, experiencing excruciating chest pain. Perry was terrified the entire time that he was about to die.

5.   At 7:00 a.m., another pass was issued for Perry, and at 9:13 a.m. he was seen at Angola's on-site clinic. There, Dr. McCain confirmed that he had a blocked artery and was experiencing a heart attack.

6.   It then took another five hours for Perry to be taken to a hospital. At 2:10 p.m. he was taken to the Lane Memorial Hospital emergency room in Zachary. He was then transferred to Our Lady of the Lake Hospital in Baton Rouge, where doctors performed a double-bypass open-heart surgery on Perry

7.   Perry did not die. But a heart attack cuts off oxygen to the heart muscle, and so with heart attacks, time equals damage. Each minute that goes by without proper care results in more damage to the heart muscle. Here, Defendants took four hundred and thirteen minutes to get Perry to the Angola clinic, and more than seven hundred and twenty minutes to get Perry to a hospital. (See Figure 1, *infra.*)

8.   For that reason, Perry now seeks compensation for the pain and fear he experienced that morning and for the lasting damage to his heart and body.



Fig. 1: Timeline of Mr. Simm's May 25, 2016 Heart Attack

2

## II.    JURISDICTION AND VENUE

9.  Plaintiff's claim arises under the Constitution and the laws of the United States. This Court has jurisdiction over Plaintiff's claims of federal rights violations, enforceable under the Fourteenth Amendment and 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). This Court has jurisdiction over Plaintiff's Louisiana state law claims in accordance with 28 U.S.C. § 1367.

10. The venue is proper in the Middle District of Louisiana under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in West Feliciana Parish, situated in the Middle District of Louisiana.

## II.  THE PARTIES

*Plaintiff*

11. Plaintiff **Perry Simms** (DOC # 124012) is of suitable age and capacity to file this suit. At all relevant time during this suit, Plaintiff was a resident of the Louisiana State Penitentiary in the Middle District of Louisiana.

*Defendants*

12. Defendant **James LeBlanc** is the Secretary for the Louisiana Department of Public Safety & Corrections. He is sued in his individual and official capacities.

13. Defendant **Dr. Raman Singh** is the Medical/Mental Health Director of the Department of Public Safety & Corrections. He is sued in his individual and official capacities.

14. Defendant **Darryl Vannoy** is the Warden of Angola. He is sued in his individual and official capacities.

15. Defendant **Stephanie Lamartiniere** is a Warden at Angola. She is sued in her individual and official capacities.

3

16. Defendant **Lt. J. Butler** is or was an officer at Angola. He is sued in his individual and official capacities.

17. Defendant **Department of Public Safety & Corrections** is a department of the State of Louisiana. It is sued as an indemnitor of its employees for state-law torts.

18. Defendants **Does 1 to 10** are as-yet unknown individuals or entities involved in the violation of Mr. Simms' rights. They include EMT # 564 who treated Mr. Simms, and the security officers who ordered him back to his dorm or failed to call an ambulance. They are sued in their official and individual capacities.

## III.        FACTS

19. Plaintiff realleges and incorporates each and every foregoing paragraph.

## A.        In December 2014, Defendants Were Warned About Angola Staff Ignoring Medical Crises

20. On December 10, 2014, the Advocacy Center, an agency with the statutory mission to protect people with disabilities and seniors living in Louisiana, wrote a letter to James LeBlanc, Burl Cain, and Stephanie Lamartiniere. In the letter, the Advocacy Center communicated that they had received reports of "Angola staff intentionally ignoring prisoners in acute medical crises for hours or days, leading to those prisoners' deaths." They alerted Defendants that "Prisoners who . . . are denied treatment and/or surgical care for serious or life-threatening conditions may needlessly suffer and/or die from problems that should be preventable or treatable."

21. Secretary LeBlanc read this letter carefully, circling and underlining key passages, including the passage about the American Correctional Association's four-minute response time standard for emergencies, and the passage about how access to care cannot be limited by a facility's resources.

22. Warden Burl Cain responded to the letter, denying any on-going problem and explaining that "[t]reatment options were . . . established for all major medical conditions, both acute and chronic, to ensure continuity of care."

23. The Advocacy Center's warnings should have come as no surprise to Defendants. In a 2014 email, a LSU hospital stroke coordinator complained, "In the past month and a half I have had three inmates from Angola that presented with obvious stroke symptoms. All of them were out of the window [for treatment] because it either took them a while to get here or the medical staff at Angola did not think the inmate was having a stroke."

24. And not long before Perry's heart attack, a nearly identical event occurred to another inmate. Angola inmate Nathan Hills (DOC # 81089) went to the treatment center with complaint of chest pain, and DOC staff sent him back to the dorm. He made emergency sick call again, and then later died.

25. Nor was this a new problem. In the 1990s, Defendants admitted in the case *Lynn v. Williams* that "inmates have died in their dormitories as a result of heart attacks." An expert in that case described that:

> At Angola [EMTs] are being used to make decisions which they are not trained or experienced in making. For example, I witnessed an inmate who complained of shortness of breath and chest pain; had a pulse taken by the EMT of 84; and was scheduled for an elective physician visit. I talked to the inmate who had a long history of hypertension and recent history of shortness of breath. I examined him and discovered leg swelling and a pulse of 116. This presentation indicated that the patient might have been in congestive heart failure. When I told the EMT about the inmate's high pulse, the medic indicated that the inmate was probably "manipulating his own pulse". This inmate should have been sent to the physician's clinic that night or the next day.
> . . .
> Recently several inmates have died in their dormitories due to heart attacks. On at least one such occasion in October of 1991, the inmate in the bed next to an inmate near the stricken inmate was capable of performing CPR. Due to the rules and regulations of the prison and the security guards refusing to allow an inmate to touch another inmate, the one person in the dormitory who could have rendered assistance was not allowed to do so.

**B.    On May 25, 2016, Perry Simms had a Heart Attack, but Was Not Taken to the Clinic for Seven Hours, and Was Not Taken to A Hospital For Twelve Hours**

26. In 2016, Perry Simms was housed in Camp D at the Louisiana State Penitentiary at Angola. Camp D had a recurring problem of not having a patrol driver available to transport inmates. For example, on April 3, 2016, Perry had to have a medical appointment rescheduled because "Camp D has

no patrol."

27. On May 25, 2016, Angola inmate Perry Simms woke up in his dormitory with intense chest pain and shortness of breath.

28. At 2:20 a.m., Perry asked the guard on duty, Lt. Butler, to call for an EMT because he was afraid he was having a heart attack.

29. At 2:45 a.m., the EMT arrived and evaluated Perry. He noted Perry's chest pain was "sharp" and that Perry was having difficulty walking, and so confirmed that he was having a possible heart attack. He wrote Perry a pass and requested that the security officers transport him to Angola's clinic.

30. The security officers refused. They said they had no patrol driver, and so could not take him to the clinic.  Instead of calling an ambulance, the security officers ordered Perry back to his dormitory.

31. Then the EMT left – without giving Perry nitroglycerin, or even an aspirin, or fulfilling any of the other protocols of the EMS Guidelines.

32. For the next five hours, Perry lay in his bed in the dormitory, experiencing excruciating chest pain. The entire time, he was terrified that he was dying.

33. At 7:00 a.m., another pass was issued for Perry, and at 9:13 a.m. he was seen in Angola's clinic. Dr. McCain confirmed that he had a blocked artery and was experiencing a heart attack. Nitroglycerin was administered.

34. It then took another four hours for Perry to be taken to a hospital. At 2:10 p.m. he was taken to the Lane Memorial Hospital emergency room. He was then transferred to the Intensive Care Unit of Our Lady of the Lake Hospital in Baton Rouge, where doctors determined that Perry needed double-bypass open-heart surgery.

35. For a week, Perry recovered at Our Lady of the Lake until being discharged on June 3, 2016.

**C.    Defendants Have Repeatedly Testified That Unexplained Chest Pain is an Emergency That Should be Addressed Immediately**

36. Dr. Singh is the Medical/Mental Health Director of the Department of Public Safety and

Corrections. On at least three occasions he has testified under oath that unexplained chest pain is an emergency situation.

37. In a July 30, 2013, deposition, Director Singh volunteered that "if you're asking for symptoms of heart attack, they can be chest pain."

38. In a May 4, 2016, deposition in which he was a 30(b)(6) representative of the DOC, Director Singh explained what an "emergent" situation is by giving the following explanation:

> Emergent means it cannot wait. It's immediately life-threatening or limb threatening. I can give you an example. A known cardiac patient is having serious chest pain. That's not urgent. That's emergent. It means he needs action. He needs to go to an ER right now.

39. Later in the deposition he repeated that that chest pain should result in a visit to the Emergency Department. In talking about Medicaid funding, he proffered the example that: "If surgery was being done in that allowable category, means he had a chest pain, you took him to an ED. He had a heart attack. He got a bypass surgery."

40. And on January 31, 2017, Director Singh testified at trial in *Hacker v. Cain* (M.D. La. 14-cv-63) that having chest pain is a serious emergency that should be addressed immediately. He swore under oath that:

> Emergency sick call is designed for any offender who's having chest pain, asthma attack or something really serious. <u>And that should be addressed immediately.</u>

(Emphasis added.)

**C.     Defendants' Treatment of Perry Simms Violated the Louisiana Administrative Code, DOC Policy, American Correctional Association Standards, Louisiana EMS Guidelines, *etc*.**

41. According to 22 LAC § 2909(E), "Inmates shall have continuous access to emergency health care by trained personnel and professional medical attention whenever required." Perry did not have continuous access to emergency health care.

42. According to the DOC's Health Care Policy HC-4 (4)(A) – each institution must have a "written plan for twenty-four-hour emergency medical, dental, and mental health services." The plan must

include "Emergency evacuation of the offender from the institution." Perry did not have access to twenty-four hour emergency medical services, nor did he have access to emergency evacuation.

43. According to the DOC's Health Care Policy HC-4 (4)(C), health care staff must be trained for a training for a "four-minute response time." Here, it took twenty-five minutes for an EMT to show up, four hundred and thirteen minutes to get Perry to the Angola clinic, and more than seven hundred and twenty minutes to get Perry to a hospital.

44. American Correctional Association (ACA) Health Care Performance Standard 1A requires that "Offenders have unimpeded access to a continuum of health care services so that their health care needs, including prevention and health education, are met in a timely and efficient manner." Perry did not have unimpeded or timely access to emergency health care.

45. The ACA standards provide that "Treatment of an offender's condition should not be limited by the resources and services available within a facility." Here, the security staff said that because they did not have a driver, they could not take Perry to the clinic, and refused to call an ambulance.

46. Angola uses the Louisiana's EMS Guidelines, which provide clear protocols for dealing with chest pain. First, they highlight that chest pain is an obvious symptom of myocardial infarction that EMS dispatchers should be able to recognize. Second, they provide a procedure for dealing with chest pain when it observed.  The Guidelines' protocol for "Acute Coronary Syndrome" (which includes heart attacks) involves a cardiac monitor, aspirin, IV, nitroglycerin every 5 minutes, monitoring of blood pressure, and morphine, until medical control can take over. The procedure highlights speed as necessary: "Paramedics treating patients within this protocol should minimize on scene time to 15 minutes." And finally, EMTs are to "Continue treatment under the appropriate protocol" on "all emergencies until Basic or Advanced Life Support (BLS and ALS) is available."

47. Here, the EMT fulfilled none of this except checking Perry's blood pressure. The EMT did not give Perry aspirin or nitroglycerin, did not apply a cardiac monitor, did not start an IV, did not provide

8

morphine, and – most importantly of all –  did not continue treatment until life support was available.

48. Defendants' 2005 EMS Protocols explain that:

> Not all patients who experience myocardial infarctin present with the classic crushing type chest discomfort. Symptoms may be very vague, especially in the geriatric age roup. The paramedic must maintain a high index of suspicion in any patient, regardless of age, who presents with symptoms including but not limited to:
> - Heavy retrosternal chest discomfort.
> - Nausea, vomiting, or diaphoresis.
> - Aching type discomfort to arm, jaw, neck, back, or shoulder.
> - Syncope or confusion
> - Epigastric discomfort.
> - Acute onset of dyspnea.
> - Acute onset of general weakness.

49. The protocol then discusses administration of aspirin, saline, nitropaste, and morphine, etc., concluding with "Contact medical control for additional orders and begin transport to receiving facility."

50. Here, the EMT noted that Perry had at least three of these symptoms - sharp chest pain, nausea, and trouble walking, but did not follow the protocol.

**D.    With Heart Attacks, Delay Equals Damage**

51.    A common expression doctors use when talking about heart attacks is that "time is muscle." This expresses the fact that damage to the heart occurs along a progressive scale with increasing duration of the heart attack. According to the joint American College of Cardiology/American Heart Association guidelines, the "principle determinant of outcome" is the "total ischemic time" - the time from which the heart attack begins until blood flow is restored (usually by medical intervention). These guidelines state that, "Greatest emphasis is to be placed on the delivery of reperfusion therapy to the individual patient as rapidly as possible."[1]

52.    Experimental animal models have shown that irreversible infarction begins as soon as 20 minutes after coronary occlusion, progressing to maximal infarction within 3 - 6 hours. Although the window in which human patients benefit from treatment appears to be larger, studies have shown that

both the number of patient lives saved and the amount of heart muscle salvaged decreases steadily with greater ischemic time. See Figure 1.[2]



**Figure 1.** Relationship between elapsed time and myocardial salvage, lives saved, and frequency of aborted myocardial infarction (MI) with reperfusion therapy. ▲ ─ ─ ─ ─ ─ represents percent of canine left ventricle salvageable after coronary occlusion/reperfusion. Solid bars represent number of lives saved per 1000 patients treated with fibrinolysis according to time from symptom onset. Hatched bars represent proportion of aborted myocardial infarction in fibrinolytic-treated patients according to time from symptom onset.

53.     For that reason, EMS units handling a patient for chest pain should treat it as cardiac ischemia unless there is a clear alternative reason for the pain.[3]

## E.    Perry Simms Exhausted His Administrative Remedies

54. On August 22, 2016, Warden Stephanie Lamartiniere issued a Step One Response to Perry's ARP. The confirmed that Perry had reported "sharp" chest pain that morning, with feelings like he "had to vomit, but could not." The Response admitted that the EMT referred Perry to the Angola clinic for further evaluation, but it was not done because of "no patrol." Warden Lamartiniere agreed that Perry had to have a "coronary artery bypass grafting," but that she could "find no evidence that you have been subjected to deliberate indifference or that your care has not met the acceptable standard of care." She wrote that "No transport is a Security Issue and would be better addressed through the Security Department." She denied his ARP. On August 25, 2016, Perry appealed that denial.

---

[1] O'Gara, P. T., Kushner, F. G., Ascheim, D. D., Casey, D. E., Chung, M. K., De Lemos, J. A., ... & Granger, C. B. (2013). *2013 ACCF/AHA guideline for the management of ST-elevation myocardial infarction.* Circulation, 127(4), e362-e425.
[2] Armstrong, P. W., Westerhout, C. M., & Welsh, R. C. (2009). *Duration of symptoms is the key modulator of the choice of reperfusion for ST-elevation myocardial infarction.* Circulation, 119(9), 1293-1303.
[3] Zafari, A. M., Aggarwal, K., Bessman, E., Coven, D. L., & Desser, K. B. (2012). *Myocardial infarction.* Medscape reference.

55. On November 1, 2016, DOC HQ issued a Step Two Response to Perry's ARP. The Response confirmed that Perry had reported experiencing chest pains at 2:20 a.m., but had not been taken to the hospital until 2:10 p.m. Despite that, Secretary LeBlanc (or his designee) determined that the care he received was "adequate" and denied his request for relief. Accordingly Perry filed this lawsuit.

## IV. CLAIMS FOR RELIEF

### Count One – Violation of the Eighth Amendment under U.S.C. 42 § 1983
### (All Defendants)

56. Plaintiff realleges and incorporates each and every foregoing paragraph.

57. "[E]elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Or in Director Singh's words: "it's our job to ensure adequate access to healthcare for offenders, no excuses, period."

58. Delay of treatment can constitute deliberate indifference to an inmates' serious medical need, thus violating the Eighth Amendment to the United States Constituion. And the "pain suffered during a delay in treatment can constitute a substantial harm and form the basis for an award of damages." *Alderson v. Concordia Parish Corr. Facility*, Case No. 15-30610 (5th Cir., Feb. 9, 2017).

59. Serious chest pains are so indicative of a serious medical need that courts take judicial notice of that fact. *Easter v. Powell*, 02-CV-280 (N.D. Tex., Oct. 8, 2004); *see also Estate of Carter v. City of Detroit,* 408 F.3d 305 (6th Cir. 2005) ("even laypersons can be expected to know that a person showing the warning signs of a heart attack needs treatment immediately in order to avoid death.")

60. . For that reason, courts have found that "a reasonable nurse would have understood that turning away a cardiac patient who was suffering severe chest pains without taking some action to provide treatment would violate that inmate's right to care for a serious medical need." *Easter v. Powell, supra* (N.D. Tex., Oct. 8, 2004).

61. The Fifth Circuit has held that the refusal to provide treatment to an inmate "suffering from severe chest pain" with a known history of cardiac problems "meets the 'deliberate indifference' threshold." *Easter v. Powell*, 467 F. 3d 459 (5th Cir. 2006). But a history of cardiac problems is not necessary. In *Sealock v. Colorado,* 218 F. 3d 1205 (10th Cir. 2000), an inmate woke up at 1:30 a.m. sweating, vomiting, pale, with a "crushing pain in his chest." A correctional officer "told him that there was nothing she could do, and that he would have to wait until six a.m. because there was no one at Clinical Services." The inmate was sent back to his dormitory until being taken to the clinic at six a.m. The Court of Appeal concluded that

> if Havens knew that appellant had unexplained chest pain, it would have been more than mere 'malpractice' or 'negligence' to fail to call an ambulance. . . . He knew that unexplained chest pain posed a serious risk to appellant's health. Failure to summon an ambulance would have disregarded that risk, arguably constituting deliberate indifference to a serious medical need.

*Id*. at 1211-1212.

62. In fact, the "refusal to get help for an obvious heart attack" is so clearly violative of the Eighth Amendment that it is used by courts of the prototypical example of deliberate indifference. *See, e.g., Robinett v. Taylor*, 15-cv-129 (S.D. Tex., Aug. 19, 2016).

63. The right to emergency treatment for chest pains as an indicator of heart trouble is a "clearly established constitutional right," and so does not merit qualified immunity when violated. *Easter v. Powell*, 467 F. 3d 459 (5th Cir. 2006); *Estate of Carter, supra,* 408 F.3d at 310 (6th Cir. 2005).

64. Here, Mr. Simm's Eighth Amendment rights were violated when Defendants (1) failed to implement a system of twenty-four hour emergency medical care; (2) failed to provide Mr. Simms with appropriate on-site emergency care; (3) ordered Mr. Simms back to his dormitory rather than calling an ambulance; and (4) took more than twelve hours to get Mr. Simms to a hospital.

## Count Two - Violations of the Louisiana Constitution
### (All Defendants)

65. Plaintiff realleges and incorporates each and every foregoing paragraph.

12

66. Article One, Section Twenty of the Louisiana Constitution forbids "cruel, excessive, or unusual punishment."

67. Here, Mr. Simm's Article One, Section Twenty rights were violated when Defendants (1) failed to implement a system of twenty-four hour emergency medical care; (2) failed to provide Mr. Simms with appropriate on-site emergency care; (3) ordered Mr. Simms back to his dormitory rather than calling an ambulance; and (4) took more than twelve hours to get Mr. Simms to a hospital.

## Count Three – State Law Negligence
### (All Defendants)

68. Plaintiff realleges and incorporates each and every foregoing paragraph.

69. Defendants' conduct described above caused Mr. Simm's harms as described above and below.

70. Due to their professional roles as jailors, Defendants owed duties of care to the persons in their custody, including Mr. Simms.

71. These duties were breached by Defendants' acts and omissions, including when they (1) failed to implement a system of twenty-four hour emergency medical care; (2) failed to provide Mr. Simms with appropriate on-site emergency care; (3) ordered Mr. Simms back to his dormitory rather than calling an ambulance; and (4) took more than twelve hours to get Mr. Simms to a hospital.

72. The risks and harms that the Defendants caused were within the scope of protection afforded by the duties they owed to Plaintiff.

73. As a result of Defendants' acts and omissions, Mr. Simms suffered actual, forseeable harm.

## Count Four – Failure to Intervene
### (EMT and Security Officer Defendants)

74. Plaintiff realleges and incorporates each and every foregoing paragraph.

75. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's rights, even though they had the opportunity to do so.

13

76. As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's rights, Plaintiff suffered pain and injury, as well as emotional distress. Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

## Count Five – Pattern Liability
### (Secretary LeBlanc, Director Singh, Warden Vannoy, Warden Lamartiniere)

77. Plaintiff realleges and incorporates each and every foregoing paragraph.

78. Prison officials are liable under Section 1983 when they were aware of and consciously disregarded a substantial risk of serious harm to a discrete class of vulnerable inmates, even if they were not aware that a particular inmate belonged to that class. *Hinojosa v. Livingston*, 807 F. 3d 657, 667 (5th Cir. 2015).

79. Here, the Advocacy Center letter and other sources of information made Defendants aware of a substantial risk of serious harm to a discrete class of vulnerable inmates (Angola inmates suffering from acute medical crises). They failed, however, to take steps to correct the problem. As a result, when Mr. Simms had an acute medical crisis, he was ignored by DOC employees.

80. The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the Defendants, were allowed to exist because policymakers with authority over these acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

81. The policies, practices, and customs set forth above were the driving force behind the constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

82. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because Defendants declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents.

## Count Six – *Respondeat Superior*
### (DOC, Secretary LeBlanc, Director Singh, Warden Vannoy, Warden Lamartiniere)

14

83.     Plaintiff realleges and incorporates each and every foregoing paragraph.

84.     While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of the DOC, Secretary LeBlanc, Director Singh, Warden Vannoy, and Warden Lamartiniere within the scope of their employment.

85.     Defendants Secretary LeBlanc, Director Singh, Warden Vannoy, and Warden Lamartiniere are therefore liable as principals for all state-law torts committed by their agents.

**Count Seven – Indemnification**
**(Department of Public Safety & Corrections)**

86.     Plaintiff realleges and incorporates each and every foregoing paragraph.

87.     Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

88.     While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of the Department of Public Safety & Corrections within the scope of their employment.

89.     Department of Public Safety & Corrections is therefore obligated by Louisiana statute to pay any judgment entered against its employees.

## V.  RELIEF REQUESTED

90.     Wherefore Plaintiff requests judgment be entered against Defendants and that the Court grant the following:

a.  Declaratory relief;

b.  A preliminary and permanent injunction requiring Defendants to provide twenty-four hour emergency response capabilities to inmates at Angola.

c.  Judgment against Defendants for Plaintiff's asserted causes of action;

d.  Award of compensatory damages;

e.  Award of special damages;

f.  Award costs and attorney's fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 28 C.F.R. § 35.175, and 29 U.S.C. § 794a(b);

g.  Order such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted, this the second day of April, 2017,

PERRY SIMMS,
By and through his counsel,

/s/ William Most_____
WILLIAM MOST
La. Bar No. 36914
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023
Email: williammost@gmail.com

16